449 A.2d 1372

EASTON THEATRES, INC.,

v.

WELLS FARGO LAND AND MORTGAGE CO., INC. and
Northeastern National Land Co., Inc., Individually and
d/b/a 25th Street Shopping Center, Appellants.

Supreme Court of Pennsylvania.

Argued April 20, 1982.

Decided July 29, 1982.

Reargument Denied Oct. 8, 1982.

James C. Hogan, Easton, for appellants.

Joseph M. Reibman, Easton, H. Donald Busch, Bala Cynwyd, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

### OPINION OF THE COURT

ROBERTS, Justice.

This is an appeal from an order of the Superior Court affirming a decree of the Court of Common Pleas of Northampton County which directed appellants Wells Fargo Land and Mortgage Co. and Northeastern National Land Co. (Wells Fargo) to construct a theatre building pursuant to a lease agreement with appellee Easton Theatres, Inc. Because Wells Fargo has complied with the decree, we dismiss the appeal as moot.[1]

The parties' agreement permitted appellee to seek financing for the construction project, provided that a mortgage be obtained "with the leased premises as the only security." Appellee obtained an offer of a loan from the Continental Bank, "evidenced by the bond or note of your companies secured by a first mortgage." Wells Fargo rejected the offer without first seeking to determine whether the requirement of a bond or note had been intended to impose personal liability or merely to afford procedural advantages to the lender in the event of default.[2]

Appellee instituted the present proceedings upon Wells Fargo's refusal to accept the proposed financing. On October 17, 1978, the court of common pleas directed Wells Fargo to commence construction of a theatre building within thirty days or post a supersedeas bond in the amount of $200,000. Wells Fargo then appealed to the Superior Court, but did

1. This case was reassigned to this writer on June 11, 1982.

2. See Ladner, Conveyancing in Pennsylvania §§ 12.01, 12.14 (4th ed. 1979).

not file a bond or seek an alternate stay. See Pa.R.A.P. 1732. While the appeal was pending, appellee sought to have Wells Fargo held in contempt for its noncompliance with the decree. On December 11, 1978, the court of common pleas denied appellee's request, concluding "that it is not in the best interest of either side for construction to commence pending appeal . . . [and] that a supersedeas bond is the least burdensome remedy." Nonetheless, Wells Fargo continued to refuse to file a bond or begin construction.

On May 7, 1979, after the Superior Court had affirmed the decree of specific performance, the court of common pleas found Wells Fargo in contempt. The Superior Court denied Wells Fargo's petition to stay the order of contempt, and at some time thereafter construction was commenced. The theatre building has been open for business since December 21, 1979.

Despite its compliance with the decree, Wells Fargo seeks a reversal of the decree on the theory that it acted properly in summarily rejecting the Continental offer. Wells Fargo also seeks a remand of the record for the fashioning of additional "appropriate relief." Presumably the latter request for relief reflects Wells Fargo's belief that it has been harmed by its having to construct the theatre at 1979 prices, instead of prices in effect in 1973, when the building was to have been built.[3]

We are not persuaded that either request for relief can survive in the face of Wells Fargo's compliance with the court's decree. "Ordinarily, a party who consents to, or

---

**3.** Wells Fargo has, of course, overlooked the fact that the increase in the construction price has resulted in a correspondingly greater return on Wells Fargo's investment. To the extent that the building constructed in 1979 is worth more, Wells Fargo receives a proportionately greater tax advantage in depreciating the building over its useful life. See *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980) (rejecting practice of discounting awards for future lost earnings to present value in favor of "total offset" approach which recognizes effect of inflation in depreciating value of dollar).

The question of whether appellee Easton Theatres in fact suffered a compensable loss as a result of the delay was not addressed by the Chancellor and remains to be decided. 265 Pa.Super. 334, 352, 401 A.2d 1333, 1343 (1979).

acquiesces in, a judgment or order cannot appeal therefrom." 9 Standard Pennsylvania Practice Ch. 38, § 162, pp. 134–35. See *Brown v. Commonwealth, Dep't of Health*, 495 Pa. 456, 434 A.2d 1179 (1981); *Reese v. Adamson*, 276 Pa. 253, 119 A. 920 (1923). Here, Wells Fargo was given every opportunity by the court of common pleas to maintain the status quo while its appeal was pending. Nevertheless, Wells Fargo chose to ignore the orders of the court of common pleas until, as a result of its own willful inaction, it had to begin construction of the theatre building or face enforcement of the contempt citation. In these circumstances, equity manifestly requires that Wells Fargo be held responsible for the consequences of its conduct and that its appeal be dismissed as moot.[4]

Appeal dismissed. Each party to pay own costs.

FLAHERTY, J., files a dissenting opinion, in which McDERMOTT, J., joins.

FLAHERTY, Justice, dissenting.

I dissent.

## I.

Wells Fargo took this appeal from an order of the Superior Court affirming the order of the Court of Common Pleas of the Third Judicial District, sitting in equity, requiring that Wells Fargo specifically perform a construction-lease contract to build and lease to Easton a theatre. The Superi-

---

**4.** We perceive no basis for addressing the merits of the controversy on a theory that collateral estoppel would be asserted to prevent Wells Fargo from initiating any future civil action against Easton Theatres. The only determination of the Superior Court from which Wells Fargo has chosen to appeal is that relating to the decree of specific performance. Wells Fargo has not challenged the Superior Court's conclusion that Wells Fargo's breach of the lease agreement may entitle Easton to recover lost profits. See supra note 2. Thus, any possibility of collateral estoppel arising from a dismissal of this appeal is a possibility of Wells Fargo's own making, and may not influence this Court's decision on whether to address the issue of specific performance long after the theatre has been built. See Pa.R.A.P. 2116. See also *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

or Court also reversed the lower court's order denying monetary damages to Easton, but Wells Fargo did not appeal that portion of the Superior Court's order. The dispute arose from a construction-lease executed by the parties in February of 1972 and amended in July of that year. Pursuant to the terms of the lease, within sixty days of execution, Easton would submit plans for the construction of the theatre and Wells Fargo would attempt to secure financing for the construction. If Wells Fargo were not able to secure financing, Easton would then have sixty days to secure financing on the same terms as those sought by Wells Fargo. The exact requirements of the lease, in pertinent part, are as follows:

> If the Landlord is unable, within sixty (60) days to get a mortgage in the amount of Two Hundred Fifteen Thousand Dollars ($215,000.00) on terms of a twenty (20) year payback with interest not to exceed 9½% *and with the leased premises as the only security,* provided no extreme conditions as to pre-payment of Landlord, the Tenant shall attempt to obtain a mortgage on these terms for Landlord, provided Landlord shall have first obtained a subordination agreement from the holder of any mortgage upon the land over which the demised premises shall be built. Tenant shall have a period of sixty (60) days from the receipt of written notice by the Landlord and subordination agreement within which to acquire the mortgage for Landlord. If the Tenant does not obtain the mortgage within the period, either party may, at its option, cancel the lease between the parties.

(Emphasis added).

Wells Fargo was not able to obtain financing within sixty days and Easton did not submit final plans for the construction of the theatre, although it did submit preliminary schematics in June of 1972. Nevertheless, the parties agreed that Easton would attempt to secure financing, and in the fall of 1972 Easton obtained a mortgage commitment from an affiliated company. Wells Fargo rejected this commitment because it contravened the terms of the lease.

Negotiations continued, and in April of 1973 Easton obtained a permanent mortgage commitment from the Continental Bank in Philadelphia. Again, Wells Fargo rejected the commitment on the grounds that its terms contravened the terms of the lease. Claiming that the lease required acceptance of Continental Bank's commitment, Easton filed a complaint in equity seeking specific performance of the lease and monetary damages.

On June 7, 1977 the chancellor in equity issued a decree nisi, ordering Wells Fargo to honor Continental Bank's mortgage commitment, if still available, or another comparable commitment, and to construct a theatre building which could have been constructed in 1972 for $215,000.00, or to post a supersedeas bond in the amount of $200,000.00. This order was based on the chancellor's finding that while Wells Fargo did not breach the lease in rejecting the first mortgage commitment obtained by Easton, Wells Fargo did breach the lease in rejecting the commitment offered by Continental Bank. Further, the chancellor ordered that the parties share equally any cost of construction in excess of $215,000.00, but denied Easton's claim for monetary damages. The *en banc* Court of Common Pleas of the Third Judicial District affirmed and adopted as its own the chancellor's adjudication, and on cross-appeals to the Superior Court, the Superior Court affirmed the lower court as to the order requiring specific performance, but reversed, remanding to the chancellor, the denial of Easton's claim for monetary damages, and remanding also for a redistribution of costs in excess of $215,000.00 based on responsibility for the delay. Wells Fargo appealed to this Court the order of specific performance.

As noted by the majority, after the Superior Court's affirmance of the order of specific performance, the court of common pleas held Wells Fargo in contempt because it had neither built the theatre nor posted a bond, and the Superior Court denied a petition to stay the contempt order. Thereafter Wells Fargo began construction on the theatre, which is now complete.

## II.

The controversy has raged at all stages of the proceedings as to which actions of the parties, if any, constitute breaches, material and otherwise, of the lease agreement, and what remedies are appropriate for those breaches, assuming that such exist. On this appeal Wells Fargo argues that the chancellor exceeded his authority in ordering it to accept a mortgage commitment requiring different terms and greater security than provided for in the lease agreement.[1] The letter from Continental Bank to Wells Fargo offering a mortgage commitment begins as follows:

> This will evidence the agreement of this institution to lend Wells Fargo Land and Mortgage Company, Inc... the sum of Two hundred fifteen Thousand ($215,000) Dollars, *evidenced by the bond or note of your companies secured by a first mortgage* on the ground containing approximately 13,000 square feet and theatre building to be thereon constructed in the 25th Street Shopping Center, Palmer Township, Pennsylvania, . . .

(Emphasis added). This requirement of a bond or note secured by a first mortgage is squarely at odds with that portion of the lease quoted above: "If the Landlord is unable, within sixty (60) days to get a mortgage in the amount of Two Hundred Fifteen Thousand Dollars ($215,-000.00) . . . *with the leased premises as the only security,* . . . the Tenant shall attempt to obtain a mortgage *on these terms* for Landlord. . . ." (Emphasis added).

It is well settled in Pennsylvania that a mortgage may be executed without personal liability:

1. There are other significant issues raised by Wells Fargo which could well have merit, the lower courts' opinions notwithstanding, viz. (1) the requirement that the lease be assigned as security for the mortgage; (2) Continental's entitlement to demand direct rental payments to cure any default by Wells Fargo; (3) the failure of Easton to supply plans as required by the lease; (4) the fact that Continental's commitment provided for permanent financing only and not construction financing as required by the lease. These additional asserted grounds for not accepting Continental Bank's financing agreement need not be addressed, however, since Continental Bank's security requirement was, in itself, sufficient to justify Wells Fargo's rejection of the offer.

"A mortgage may be created as well without as with an accompanying personal obligation of the mortgagor to pay the debt secured, or attempted to be secured, thereby. In the one case the property alone is charged with the lien—is looked to solely by the mortgagee out of which to make his lien; in the other, he has the *additional security* of the personal obligation of the mortgagor. A debt chargeable only against certain property is, in effect, simply a debt with limited means of satisfaction or enforcement; the value of the property charged with the indebtedness is the measure of the security afforded."

*Hartje's Estate*, 345 Pa. 570, 574, 28 A.2d 908, 910 (1942) (Citations omitted) (Emphasis added). It is likewise well established that a note or bond which is not specifically restricted acts to create general liability. Absent an express covenant in the mortgage, however, general liabiity does not arise on the mortgage itself, but only on the bond or note:

"[A] mortgage is not of itself an instrument by which a personal liability for the money is raised, and on which an action of debt or covenant can be maintained by the mortgagee against the mortgagor, but ... his remedy on such mortgage, is confined to the land itself which is put in pledge; yet, *if there be any prior or accompanying cause of action, which of itself creates a personal liability, distinct from the mortgage, such as a loan, or bond, a note or other claim, the mortgage is not to be considered as merging such claim or demand, but is merely a collateral security.* Mortgages, in this state are usually accompanied by a bond and warrant of attorney, etc. Sometimes they are given to secure notes, or other instruments, sometimes to secure warrants of indemnity, and sometimes in the naked, simple form of a mere mortgage, given for the purpose perhaps of securing the debt of a third person, and when *they are given in any of these modes it has never been supposed, that an action of debt or covenant for the money will lie upon the mortgage itself, but the remedy of the party upon the mortgage is against the land, and the land only.*"

*Baum v. Tonkin*, 110 Pa. 569, 573, 1 A. 535, 537 (1885) (Citations omitted) (Emphasis added).

The effect of executing a bond or note secured by a mortgage, unless recourse on the bond is specifically limited, is to subject all of the real and personal property of the obligor to execution in the event of default. Ladner writes:

> The bond and mortgage, although separate and distinct instruments, are securities for one and the same debt. . . . The bond and warrant of themselves create no lien until one (or both) of them is entered as a judgment, when it becomes a lien against all real estate owned by the obligor and situated within the county, from the date of its entry. . . . In some instances, when the mortgaged property has depreciated in value and the mortgagor has other property, the advantages of proceeding on the bond or warrant are obvious, *since the bond is a personal obligation of the obligor and a judgment on it permits execution against any of his real or personal property.* For this reason, the bond and warrant is usually demanded and given along with the mortgage.

*Conveyancing in Pennsylvania*, § 9:01 (3d Edition, 1961) (Emphasis added), *See also Neville v. Kretzschmar*, 271 Pa. 222, 114 A. 625 (1921).

In this case, the requirement of a bond or note which was not specifically limited as to recourse had the effect of requiring additional security not contemplated in the lease. It is clear from the record and the lease that the parties intended the mortgagee's recourse in the event of default to be limited to the leased premises. Whether such a bargain is ordinary or wise is not our inquiry. Our function and the proper function of the chancellor is to enforce the terms of the agreement insofar as they may be determined with certainty. Wells Fargo committed no breach of the terms of the lease by declining to agree to provide the *additional security*, to wit, a bond or a note, required by Continental Bank as security in excess of that provided for in the lease.

### III.

An initial observation made by the majority is that Wells Fargo rejected the offer of Continental Bank without first seeking to determine whether Continental's requirement of a bond or note was intended to impose personal liability or merely to afford procedural advantages to the lender in the event of default. At 1372–1373. Although a bond executed in connection with a mortgage does not always involve personal liability of the mortgagor (see discussion *supra*) personal liability on the bond is the rule and its absence the exception. *See* Ladner, *Conveyancing in Pennsylvania,* § 9.01, § 9.22 (3d Edition, 1961). It was reasonable, therefore, for Wells Fargo to assume that personal liability was intended and to have refused the offer for that reason. If Continental Bank did not intend that Wells Fargo be personally liable on the bond, it could have communicated that intention clearly.

The majority also implies that Wells Fargo may not have been harmed by having to construct the theatre at 1979 prices under mortgage terms to which it did not consent. At 1373, n.3. It is sufficient to respond that Wells Fargo's realization of greater tax advantages in depreciating the building goes to the amount of loss it suffered, not to the existence of damages.

Additionally, in dismissing this appeal, the majority misplaces its reliance on the principle that "Ordinarily, a party who consents to, or acquiesces in, a judgment or order cannot appeal therefrom," At 1373. To no extent can the timely appeal taken by Wells Fargo challenging the validity of the trial court's order be regarded as manifesting consent to and acquiescence in the order in question. As the majority itself observes, Wells Fargo did not begin construction until after the Superior Court affirmed the decree of specific performance and the court of common pleas held Wells Fargo in contempt. This can hardly be called acquiescence or consent to a judgment order.

By holding the instant appeal to be moot, the majority places a new limitation on appeal rights not heretofore in existence. While Wells Fargo refrained from pursuing its option under Pa.R.A.P. 1732 of seeking a stay, and the alternative of posting a supersedeas bond, it acted within its rights in so doing. The record in the present case does not establish the reason for Wells Fargo's decision to build the theatre rather than post a supersedeas bond. It may be that the cost of the bond, coupled with the conviction that the lower courts were in error on the merits of the case, and the business decision that it would be less costly to build a theatre under adverse contractual conditions than to tie up the land with no use at all for an additional extended period of time, pending appeal to this Court, led Wells Fargo to build the theatre rather than post the bond.

In any case, as the majority correctly points out, Wells Fargo was given the choice by order of the court of common pleas of building the theatre or posting a $200,000 supersedeas bond. The purpose of the bond is to protect the interests of the judgment creditor, and so long as that interest is protected, the choice of how it shall be protected—by specific performance or by the posting of a bond—is that of the judgment debtor. Appeal rights are not cut off merely because the judgment debtor exercises one of the options offered by the trial court, unless, of course, the case becomes moot as a result of an action by that party.

Central to the majority's position, therefore, is the question of whether the case is moot. Mere completion of an act does not foreclose appellate relief on grounds of mootness if there are circumstances in the case which require equitable relief in order to complete the litigation:

> [T]here is an exception to the general rule that a case or controversy must exist at all stages of appellate review. If one of the parties to the controversy will continue to suffer some detriment from the lower court's decision, the appeal will usually be heard.

*Janet D. v. Carros*, 240 Pa.Super.Ct. 291, 311, 362 A.2d 1060, 1070 (1976). Wells Fargo will, in the language of the *Carros* case, continue to suffer detriment from the lower court's decision, and the case should not be dismissed as moot for this reason alone. Additionally, this Court certainly has the power to review a matter where, in an action before an equity court there has been a request for general relief, the equities require that relief be fashioned, and it is possible that relief can in fact be fashioned.[2] In *Sigal v. Manufacturers Light and Heat Co.*, 450 Pa. 228, 299 A.2d 646 (1973), the chancellor dissolved a preliminary injunction forbidding the construction of a pipeline and refused to grant a permanent injunction. Construction of the pipeline was completed before an appeal was taken to this Court, and on appeal, the pipeline builder argued that the appeal should be quashed because the controversy was moot. This Court refused to quash the appeal, stating:

> The complaint requested not only injunctive relief, but also prayed for damages, punitive and otherwise, and also requested general relief. Equity had proper jurisdiction in this matter and may, *under the prayer for general relief, validly frame any proper relief agreeable to the case pleaded and proven.*

> \* \* \* \* \* \*

The appellee has relied on various cases to sustain its contention that a controversy is moot if the act to be enjoined has been completed.... The appellee is correct that in the [cases it cites] the act to be enjoined had been completed and equity did not give any relief. In all these cases, however, *equity declined to act, not because the act sought to be enjoined had been completed, but because any relief, other than injunctive relief, would have been*

---

**2.** I express no opinion as to whether Wells Fargo should receive damages. Such a determination is for the chancellor. What is clear, however, is that the case is not moot and should be remanded for the chancellor to make the decision as to whether damages are required in the case.

*inappropriate. In none of the cases cited was there a continuing trespass or any other circumstances which required equitable relief in order to complete the litigation.*

450 Pa. at 231–33, 299 A.2d at 647–48 (Emphasis added). *See also Faden v. Philadelphia Housing Authority,* 424 Pa. 273, 227 A.2d 619 (1967). In the present case there was a prayer for general relief,[3] it is possible that appropriate relief can be fashioned, and consideration of the case on its merits is necessary to complete the litigation. The appeal should not, therefore, be dismissed as moot.[4]

For these reasons, the order requiring Wells Fargo to accept the mortgage commitment from Continental Bank and to build the theatre was in error and deprived Wells Fargo of the benefit of its bargain by requiring it to accept terms in the mortgage commitment which were significantly different from the terms it had bargained for. The order of the Superior Court as to specific performance should be reversed and the case remanded to the chancellor for further proceedings, the purpose of which would be to restore Wells Fargo to the position it would have been in had it not been ordered to build the theatre.

McDERMOTT, J., joins in this dissenting opinion.

3. The fact that the prayer for general relief was contained in *Easton's* original complaint, does not prevent this Court from deciding the issues properly before us, even if our decision is adverse to the interests of Easton. "Once equity obtains jurisdiction, that jurisdiction continues until all issues raised have been determined." *McGovern v. Spear,* 463 Pa. 269, 272–73, 344 A.2d 826, 828 (1975).

4. The mootness cases cited by Easton, *Keystone Building Company v. Lincoln Savings and Loan Association,* 439 Pa. 444, 266 A.2d 648 (1970) and *Fox v. Central Delaware City Authority,* 475 Pa. 623, 381 A.2d 448 (1977) are distinguishable from the instant case. In *Keystone* the appeal was declared moot because appellant could be made whole in proceedings which were pending below; in *Fox* the appeal was moot because the issues originally raised on appeal were no longer at issue, and new issues, never addressed by a lower court were introduced.